UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES MURTHA,

               Plaintiff,

   -against-

NEW YORK STATE GAMING COMMISSION,
BRIAN BARRY, DR. STEPHANIE WOLF, and
THOMAS KOTARSKI,

               Defendant.

No. 17 Civ. 10040 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

     Plaintiff James Murtha brings this action pursuant to Title I and Title V of the Americans

with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Age Discrimination in Employment

Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, the Family Medical Leave Act ("FMLA"), 29 U.S.C. §

2601 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et*

*seq.*, seeking redress for Defendants' alleged unlawful employment discrimination.  Plaintiff filed

a First Amended Complaint on August 2, 2018. (ECF No. 16.)   Plaintiff avers, *inter alia*, that he

was discriminated against on the basis of his age and alleged disability while working for

Defendant New York State Gaming Commission.   (*Id.* ¶¶ 2, 12.)

     Presently before the Court is Defendants' motion to dismiss Plaintiff's claims under the

ADEA and the NYSHRL, and Plaintiff's claims sounding in discrimination under the ADA, and

to dismiss in part Plaintiff's claim sounding in retaliation under the ADA, for failure to state a

claim for which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF

No. 22.)  For the following reasons, Defendants' motion is GRANTED in part and DENIED in

part.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/17/2019

# BACKGROUND

## I.      Factual Background

The following facts are drawn from the First Amended Complaint ("FAC") and are accepted as true for the purposes of this motion.

Between September of 2014 and September 30, 2017, Plaintiff was employed by Defendant New York State Gaming Commission ("NYSGC") as a racing inspector at its Yonkers Raceway. (*Id.* ¶ 12.)  Plaintiff was approximately 53-years-old at the time of his hire.  Plaintiff's duties included inspecting and testing horses involved in races at Yonkers Raceway.  (*Id.* ¶ 13.) His work regularly required him to work in the horses' stalls, where Plaintiff would perform such tasks as taking urine samples from the horses.  (*Id.*)  Plaintiff's other duties included identifying horses outside of the stalls ("ID work"). (*Id.* ¶ 15.)

Plaintiff states that he was offered his job with the NYSGC by Defendant Brian Barry, the Director of Racing Officials for the NYSGC.  (*Id.* ¶ 9.)  According to Plaintiff, Barry interviewed Plaintiff and offered Plaintiff employment with the NYSGC immediately after the interview, without consulting with anyone else as to Plaintiff's hire.  (*Id.*)  During the time that Plaintiff worked for the NYSGC, Barry had the power to fire employees and did so.  (*Id.*)  Defendants Dr. Stephanie Wolf and Thom Kotarski[1] were the Supervising Racing Veterinarian and Supervising Inspector, respectively, of the NYSGC at Yonkers Raceway. (*Id.* ¶¶ 10-11.)  Wolf and Kotarski were Plaintiff's direct supervisors, and Barry was the direct supervisor of Wolf and Kotarski. (*Id.* ¶¶ 9-11.)

In December of 2014, Plaintiff began to develop the symptoms of a respiratory allergy, including a burning throat, raspy and hoarse voice, burning and aching sinuses, lung pain,

---

[1] Defendant Thom Kotarski is incorrectly sued herein as "Thomas Kotarski."  (Defs.' Mem. Supp. Mot. to Dismiss (ECF No. 22) 1.)

shortness of breath, and disorientation.  (*Id.* ¶ 15.)  The symptoms abated when Plaintiff was assigned to perform ID work, which took place outside of the horses' stalls.  (*Id.*)  Plaintiff's allergic symptoms led to multiple hospitalizations and required Plaintiff to take several periods of extended leave.  (*Id.* ¶¶ 16-23.)  Ultimately, in early 2017, Plaintiff was diagnosed by an immunologist with occupational induced asthma.  (*Id.* ¶ 24.)

In 2015, Plaintiff told Barry, Kotarski, Wolf, nonparty Presiding Racing Judge Nick Ferriero, and other nonparty supervisors about his asthma and respiratory issues, and his need to take medication and fresh air breaks to cope with those issues.  (*Id.* ¶ 25.)  In the spring of 2017, Plaintiff asked to be assigned duties outside of the stalls, particularly performing ID work, but his requests were denied.  (*Id.* ¶¶ 26-27.)  When Plaintiff asked Kotarski if he could be moved out of the stalls, even temporarily, Kotarski sent Plaintiff to Ferriero, then to Wolf, and then to Barry, none of who granted Plaintiff's request.  (*Id.* ¶ 31.)    Plaintiff wrote to Barry about his request to be moved out of the stalls and about alleged harassment he claimed to be experiencing, as detailed below, in July of 2017, but Barry took no action in response to Plaintiff's letter. (*Id.* ¶ 32.)  Instead, Plaintiff avers that after he made his requests, his supervisors kept him working inside the stalls for longer periods than any of his co-workers who were also racing inspectors.  (*Id.* ¶ 27.)  Specifically, when Plaintiff informed Wolf that he was having an asthma attack, she insisted that he stay longer with the horses in the stalls.  (*Id.* ¶ 28.)  Plaintiff does not specify when this incident occurred or allege that similar incidents occurred on other occasions.

Plaintiff states that other racing inspectors were permanently assigned to ID work, even though they had less experience with ID work than he did.  (*Id.* ¶ 26.)  When he was ultimately told that his supervisors would not assign him to ID work, Plaintiff learned that the assignment

was given to a younger woman, who had less seniority than Plaintiff but who did not have any breathing, allergy, or health issues.  (*Id.* ¶ 33.)

   In the year prior to his termination, Plaintiff alleges that some of his co-workers began to harass him and joke about his asthma.  (*Id.* ¶ 34.)  One of Plaintiff' co-workers, who was aware of Plaintiff's respiratory condition, shut the air conditioning off in the break room on several occasions during the summer of 2017 and allegedly hid the remote control for it so that Plaintiff could not use it when he entered the break room to alleviate his asthma.  (*Id.* ¶ 35.)  Plaintiff filed a written complaint with nonparty Ferriero regarding one such incident on August 18, 2017, but no action was taken.  (*Id.*)

   Plaintiff also complains that other employees smoked cigarettes around him and laughed when Plaintiff told them that it triggered an asthmatic reaction.  (*Id.* ¶ 36.)  Some co-workers would sarcastically offer Plaintiff cigarettes and invite him to join them.  (*Id.* ¶ 38.)  Another co-worker smoked e-cigarettes in the heated indoor office during the winter, aggravating Plaintiff's symptoms.  (*Id.* ¶ 37.)  Plaintiff informed Kotarski and others of the e-cigarette incidents, but no action was taken.  (*Id.*)

   During his employment with the NYSGC, Plaintiff alleges that younger employees with less experience were promoted and given cleaner and more desirable jobs, while Plaintiff remained in the horses' stalls despite being verbally promised by his supervisors that he would be moved out of the stalls within one year of his hire. (*Id.* ¶¶ 39-40.)  Plaintiff also states that his supervisors routinely pressured older workers into quitting, either by refusing to promote them or demoting them, or terminated their employment for no reason.  (*Id.* ¶¶ 40-42.)  Plaintiff cites the experiences of two former NYSGC employees as purported evidence of this practice.  (*Id.*)

Plaintiff further alleges that younger employees were able to commit various infractions, including arriving late to work, leaving early, or watching television during work hours, without being punished. (*Id.* ¶¶ 43-45.) Plaintiff states that some younger employees, including Kotarski, would play baseball or basketball with the specimen cups that were meant to be kept sterile and used only for horses, and then would place damaged cups back for official use after their games. (*Id.* ¶ 44.) Plaintiff spoke to Kotarski and another employee about the damaged cups leaking and requested that the games stop, but his complaint was met with laughter. (*Id.*)

In July of 2017, Plaintiff applied for medical leave pursuant to the FMLA. (*Id.* ¶ 46.) On August 17, 2017, Plaintiff was granted a general approval of up to twelve weeks of leave. (*Id.*) However, Plaintiff did not take that leave, because he heard from Kotarski, Wolf, and other employees that Barry was very angry with him for applying for FMLA leave. (*Id.* ¶¶ 47-48.)

On July 26, 2017, Plaintiff filed a Charge of Discrimination (the "EEOC Charge") with the United States Equal Employment Opportunities Commission ("EEOC") by completing the EEOC's Intake Questionnaire. (*Id.* ¶ 50.) In the Intake Questionnaire, Plaintiff states that he identified the NYSGC as his employer and listed his employer's address as Yonkers Raceway. (*Id.*) By letter dated September 18, 2017, an EEOC investigator informed Plaintiff, *inter alia*, that it had notified Plaintiff's employer that Plaintiff had filed the EEOC Charge. (*Id.* ¶ 50; Ex. A.) Plaintiff states that the EEOC's letter was copied to the NYSGC at the Yonkers Raceway. (*Id.* ¶ 50.) Plaintiff received his notice of right to sue from the EEOC on September 30, 2017. (*Id.* ¶ 5.)

On September 22, 2017, and September 23, 2017, Ferriero called Plaintiff on the phone and told him not to report to work, but refused to explain the basis for his directives. (*Id.* ¶¶ 52-52.) Shortly thereafter, Ferriero met Plaintiff at the Yonkers Raceway and told Plaintiff that he was no longer allowed on the premises. (*Id.* ¶ 53.) On September 30, 2017, Plaintiff was told by

Ferriero that he was fired because he "didn't fit." (*Id.* ¶ 54.) Plaintiff's termination was confirmed by letter dated October 4, 2017. (*Id.*)

## II.       Procedural Background

Plaintiff commenced this action on December 22, 2017. (ECF No. 1.) Plaintiff filed the FAC on August 2, 2018. (ECF No. 16.) Plaintiff sues: (1) Barry, in his official capacity, under Title I and Title V of the ADA, the ADEA, and the FMLA, and (2) all Defendants in their individual capacities under the NYSHRL. (FAC ¶¶ 56-85.) Plaintiff alleges that Defendants discriminated and retaliated against him on the basis of his age and disability. (*Id.*) Plaintiff seeks restoration of his employment and related relief under all four statutes, and compensatory and punitive damages under the NYSHRL. (*Id.*)

Defendants move to dismiss Plaintiff's claims sounding in discrimination under the ADA, ADEA, and NYSHRL, and retaliation under the ADEA and NYSHRL, pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Mem. Supp. Mot. to Dismiss ("Defs.' Mem.") (ECF No. 22) 1-2.) Defendants also move for partial dismissal of Plaintiff's ADA retaliation claim, to the extent that the claim is based on Defendants' alleged retaliation for Plaintiff's filing of the EEOC Charge. Defendants do not move to dismiss Plaintiff's fifth cause of action for retaliation pursuant to the FMLA. Plaintiff opposes the motion. (ECF No. 24.)

## LEGAL STANDARD UNDER RULE 12(B)(6)

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the factual content pleaded allows a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be

supported by factual allegations." *Id.* at 679.  In considering a Rule 12(b)(6) motion, the Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).  Similarly, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678.

Further, a court is generally confined to the facts alleged in the complaint for the purposes of considering a motion to dismiss pursuant to Rule 12(b)(6).  *Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991).  A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit.  *See Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013).

A "discrimination complaint need not allege facts establishing each element of a *prima facie* case of discrimination to survive a motion to dismiss," but must "at minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (citations omitted); *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002).  Thus, "courts in this District have 'held that elements of a *prima facie* case provide an outline of what is necessary to render a plaintiff's employment discrimination claims for relief plausible.'" *Mesias v. Cravath, Swaine & Moore LLP*, 106 F. Supp. 3d 431, 436 (S.D.N.Y. 2015) (quoting *Johnson v. Morrison & Foerster LLP*, No. 14-CV-428(JMF), 2015 WL 845723, at *3 (S.D.N.Y. Feb. 26, 2015)).

## DISCUSSION

The FAC contains a total of eight causes of action.  Plaintiff's first and third causes of action allege that Defendant Barry, in his official capacity, violated the ADA and the ADEA, by discriminating against Plaintiff on the basis of his alleged disability and age, respectively. Plaintiff's second, fourth, and fifth causes of action allege that Defendant Barry, in his official capacity, violated the ADA, ADEA and FMLA by retaliating against Plaintiff on the basis of his engagement in a protected activity.  Plaintiff's sixth, seventh, and eighth causes of action allege that Defendants Barry, Wolf, and Kotarski, in their individual capacities, violated the NYSHRL based on the same conduct underlying Plaintiff's first through fifth causes of action.

Defendants move to dismiss Plaintiff's first, third, fourth, sixth, seventh, and eighth causes of action in their entirety, and to dismiss Plaintiff's second cause of action in part.  The Court considers the sufficiency of those claims below.

### I.       Plaintiff's ADEA Discrimination Claims

The ADEA provides that it is "unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  This protection extends to employees who are over the age of 40.  *See id.* § 631(a).  To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must demonstrate that (1) he was within the protected age group, (2) he was qualified for his position, (3) he suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances giving rise to an inference of impermissible age discrimination, such as the fact that the plaintiff was replaced by someone "substantially younger."  *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)); *see*

*Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010).  An ADEA discrimination plaintiff may demonstrate age discrimination based on overt conduct, disparate treatment, or a hostile work environment.[2]

Plaintiff states that he suffered discrimination under the ADEA because he was discharged and subjected to a hostile work environment due to his age.  On the instant motion, Defendants do not dispute that Plaintiff is within the ADEA's protected age group, that he was qualified for his position as racing inspector, and that his discharge constitutes an adverse employment action. However, Defendants contend that (1) to the extent Plaintiff's ADEA discrimination claim is based on Defendants' failure to permanently assign Plaintiff to ID work, Plaintiff fails to allege an additional adverse employment action, (2) Plaintiff fails to plausibly allege that he was discharged under circumstances giving rise to an inference of age discrimination, and (3) Plaintiff fails to plausibly allege that he was subjected to a hostile work environment based on his age. (Defs.' Mem. 8.)  The Court agrees with Defendants on all counts.

### a.  Adverse Employment Action

"A Plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015) (internal quotation marks omitted) (citing *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).  To be "materially adverse," a change in working

---

[2] As Defendants note in their moving papers, (Defs.' Mem. 8-9), a plaintiff alleging age discrimination is ultimately required to establish that age was the "but for" cause of the employer's adverse action, and not merely that it was a motivating factor.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009).  However, courts in this District have disagreed as to whether a plaintiff in an ADEA case must plead "but for" causation to survive dismissal, or whether he may satisfy the pleading standard by "merely providing minimal support for the proposition that the defendant was motivated by discriminatory intent."  *Zoulas v. N.Y.C. Dep't of Educ.*, No. 1:18-CV-2718(GHW), 2019 WL 4090057, at *14 (S.D.N.Y. Aug. 29, 2019) (comparing cases); *see Tweedy v. City of New York*, No. 1:18-CV-1470 (ALC), 2019 WL 1437866, at *4 (S.D.N.Y. Mar. 29, 2019); *Fagan v. U.S. Carpet Installation, Inc.*, 770 F. Supp. 2d 490, 496 (E.D.N.Y. 2011).  Since Plaintiff fails to show that age was a mere motivating factor in his termination, let alone the "but for" factor, the Court need not rule on this issue.

conditions must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (internal quotation marks omitted) (citing *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Examples of materially adverse changes include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities." *Id.* at 85 (quoting *Terry*, 336 F.3d at 138). In contrast, "[e]veryday workplace grievances, disappointments, and setbacks do not constitute adverse employment actions." *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 260 (S.D.N.Y. 2011). While a denial of a promotion may be considered an adverse employment action, a plaintiff must "allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely assert[] that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998); *see also Smith v. City of New York*, 385 F. Supp. 3d 323, 337 (S.D.N.Y. 2019); *Barett v. Forest Labs, Inc.*, 39 F. Supp. 3d 407, 442 (S.D.N.Y. 2014).

It is beyond dispute that Plaintiff's discharge qualifies as an adverse employment action. However, Defendants' refusal to grant Plaintiff's request to be placed on permanent ID work or otherwise "promote[] and give[] easier jobs" to Plaintiff, (FAC ¶ 39), does not constitute a change in Plaintiff's working conditions sufficient to alter the terms and conditions of Plaintiff's employment. Indeed, it involves no change at all to Plaintiff's preexisting job duties and conditions of employment.

Moreover, Plaintiff does not allege an adverse employment action under a failure to promote theory because Plaintiff does not identify with specificity a promotion that he sought and was denied, nor does he assert that he has ever applied for a promotion or that there were open positions into which he could have been promoted. *See Wheeler v. Bank of N.Y. Mellon*, 256 F.

Supp. 3d 205, 217-18 (N.D.N.Y. 2017) (ADEA plaintiff's failure to promote claim dismissed because plaintiff failed to allege sufficient facts about promotion, including qualifications expected of applicants for that position, or her own qualifications for that position); *Dickens v. Hudson Sheraton Corp.*, 167 F. Supp. 3d 499, 521 (S.D.N.Y. 2016) (plaintiff's failure to show that employer was seeking applicants for position plaintiff sought, or that there were any vacancies into which plaintiff might be placed, was fatal to plaintiff's failure to promote claim on motion for summary judgment).

While Plaintiff asserts that he requested reassignment to permanent ID work, he does not plead that permanent ID work was superior to the work he was performing in the stables in any material respect, other than its being generally "easier."[3] For instance, Plaintiff does not state that employees directed to perform permanent ID work have increased salaries or benefits, or otherwise enjoy tangibly better working conditions than employees working in the stables.  Instead, Plaintiff states that he wrote a letter to Defendant Barry seeking an assignment of permanent ID work as a "reasonable accommodation" for his alleged disability, and asked for the same on other occasions because he "had performed IDs in the past and was more experienced at it than some of the employees who were assigned to do the work permanently."  (*Id.* ¶ 29.)   In sum, even Plaintiff does not characterize ID work as a promotion.

Accordingly, Defendants' failure to promote Plaintiff or assign him to permanent ID work does not constitute adverse employment action.

---

[3] As an aside, Plaintiff's subjective dissatisfaction with his own work assignment would be insufficient to allege an adverse employment action, even if Plaintiff had pled that he was assigned to permanent ID work before being reassigned to work in the stables.  *See Smith v. City of New York*, 385 F. Supp. 3d 323, 336 (S.D.N.Y. 2019) (police officer's reassignment from training to mail duty was not adverse employment action).

### b.  Inference of Discrimination

Circumstances that may "give rise to an inference of discriminatory motive" include "actions or remarks made by decisionmakers that could be viewed as reflecting a discriminatory animus," as well as "preferential treatment given to employees outside the protected class." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 91 (2d Cir. 1996).  Thus, a plaintiff may sustain an age discrimination claim by pleading facts showing direct discriminatory animus or by pleading disparate treatment.  A plaintiff claiming disparate treatment must allege that he was "similarly situated in all material respects" to the individuals with whom he seeks to compare himself.  *Graham v. Long Island R. R.*, 230 F.3d 34, 39 (2d Cir. 2000); *see Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003).

With respect to disparate treatment, a plaintiff merely alleging that he was passed over for promotions or terminated, while others outside of his protected class were not, does not state an ADEA discrimination claim.  "Without any specificity as to the qualifications considered for each position and without any reference to specific statements or individual circumstances that suggest discriminatory treatment, [a plaintiff's] allegations do not support a finding that defendants acted with a discriminatory purpose."  *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015); *see also Johnson v. Andy Frain Servs., Inc.*, 683 F. App'x, 68, 70-71 (2d Cir. 2016) (finding ADEA discrimination claims properly dismissed where plaintiff claimed she was fired while co-worker outside of her protected class was not because Plaintiff failed to allege that her co-worker had similar job descriptions or responsibilities); *Delaney v. Bank of Am. Corp.*, 908 F. Supp. 2d 498, 505 (S.D.N.Y. 2012) (ADEA plaintiff failed to establish an inference of discrimination by identifying two older employees that were laid off because plaintiff did not provide any evidence

as to whether, *inter alia*, the older employees were terminated by the same individual that terminated the plaintiff or were replaced by younger workers).

Here, Plaintiff does not allege any discriminatory comments or other overt discriminatory conduct directed against him or other employees based on their age.  Instead, Plaintiff alleges that younger employees were treated more favorably than older employees. (FAC ¶¶ 39, 43-45.) Plaintiff states that younger employees "were promoted and given easier jobs even though Plaintiff had seniority and was the more reliable and dependable worker."  (FAC ¶ 39.)  Plaintiff, who worked for the NYSGC for three years and alleges no prior experience or expertise in performing his job as racing inspector, provides no facts tending to support his conclusory categorization of himself as "more reliable and dependable" than his younger colleagues.  More importantly, Plaintiff does not specifically identify any employee who received a promotion while he was working for the NYSGC.  As to younger employees who received "easier jobs," Plaintiff names one "younger woman," Lauren Spencer, who allegedly received the permanent ID work assignment Plaintiff sought.  (*Id.* ¶ 33.)   Plaintiff states that Spencer "had less seniority than [Plaintiff]" but was nevertheless given the assignment.  (*Id.*)   Plaintiff provides no other information about Spencer or the assignment, including her qualifications relative to his own or the date on which Spencer was assigned.[4]  Thus, even if the Court were to credit Plaintiff's conclusory statement that he was generally a "more reliable and dependable" worker than his younger colleagues, Plaintiff falls far short of pleading that he was "similarly situated in all material respects" to Spencer.  Given the facts presented in the FAC, Spencer's assignment to ID

---

[4] Plaintiff supplements this claim in his Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Plaintiff's Memorandum") by stating that Spencer was assigned ID work in "July/August 2017." (Pl.'s Mem. 19.)

work in July or August of 2017 does not raise an inference of age discrimination as to Plaintiff's termination.

Plaintiff also alleges that "younger employees such as Terrell Hill and Tyrone Stephens [were given] more leeway for lateness and other work infractions." (FAC ¶ 43.) Specifically, Plaintiff complains that such employees were not punished for their alleged infractions, which included playing games with specimen cups meant to be kept sterile. (*Id.* ¶ 44.) Significantly, Plaintiff does not state that he or *any* employee was punished for the same or comparable behavior. Contrary to Plaintiff's contentions, a uniform failure to discipline employees for certain infractions does not support an inference that Plaintiff was terminated due to his age.

Finally, Plaintiff avers that it was "common for [Defendants] to pressure older workers into quitting or to terminate them outright for no reason, due to their age." (*Id.* ¶ 39.) Plaintiff cites to the treatment of two employees to support this proposition. One "older employee, Jim Perkowski, was eligible and qualified for a promotion, but was passed over for a much younger, less qualified individual." (FAC ¶ 41.) Perkowski quit "soon thereafter." (*Id.*) The second employee, Mike Dinger, was 58 years old when he was demoted from recording judge to inspector after working for the NYSGC for 35 years. (*Id.* ¶ 42.) Plaintiff allegedly heard from colleagues that "supervisors were hoping that the demotion would force Dinger to leave." (*Id.*) Dinger was eventually fired by Defendant Barry after being told by Barry, "[W]e are going in a new direction and no longer need your services." (*Id.*)

Plaintiff's allegations do not support an inference of discrimination as to his own termination. Even accepting as true Plaintiff's conclusory assertion that neither Perkowski's being denied promotion nor Dinger's being demoted and fired were for cause, there is no indication in the FAC, explicit or implicit, that those employment decisions were based on the employees' ages.

14

*See Burgis*, 798 F.3d at 69-70 (black plaintiffs' assertion that they were demoted or passed over for promotions while white colleagues were not demoted and received promotions did not constitute circumstances giving rise to an inference of discrimination).   Since it is "equally possible" that the employment actions taken against Perkowski and Dinger were taken for "valid, non-discriminatory reasons," they do not support an inference of age discrimination.  *Id.* at 70; *see Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

### c.  Hostile Work Environment

The ADEA prohibits "'requiring people to work in a discriminatorily hostile or abusive environment.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 41 (2d Cir. 2019) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).  The standards for assessing a hostile work environment claim under the ADEA are analogous to those utilized under 42 U.S.C. § 2000e et seq. ("Title VII").  *See id.* (analyzing ADEA hostile work environment claim based on standards announced in cases involving claims of hostile work environment discrimination under both Title VII and the ADEA).  Thus, the ADEA is "violated when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  *Id.* Under the ADEA, "[a] work environment will be considered hostile if a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it because of conduct based on the plaintiff's over-40 age."  *Id.* at 41 (quotation marks omitted) (citation omitted).  "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (quoting

15

*Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997)). To assess a hostile work environment claim, courts consider "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with [the] employee's work performance." *Harris*, 510 U.S. at 23. "Minor incidents do not merit relief." *Kasner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 240 (2d Cir. 2007).

Importantly, a plaintiff must "demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999); *see Alfano*, 294 F.3d at 377 (behavior that is "harsh, unjust, and rude" does not rise to the level of a hostile work environment where there is no indication that such behavior is linked or correlated to the claimed ground of discrimination). Thus, to the extent Plaintiff relies on incidents of alleged hostility that have no connection to his age (i.e., his colleagues' joking about his asthma, smoking, and shutting off the air conditioning), he does not state a claim for hostile work environment under the ADEA. *See Pfizenmayer v. Hicksville Pub. Sch.*, No. 15-CV-6987(SJF)(SIL), 2017 WL 5468319, at * 11 (E.D.N.Y. Jan. 24, 2017) (plaintiff did not plausibly allege hostile work environment where plaintiff alleged a series of acts that were not "connected to plaintiff's age").

The conduct alleged by Plaintiff that bears any arguable relationship to Plaintiff's age consists of (1) one younger employee being given an easier job assignment over the Plaintiff, (2) younger employees committing workplace infractions, for which no employee was ever punished, without consequence, and (3) two older employees being demoted or fired without cause.

Plaintiff does not allege that any of the foregoing conduct interfered with his work performance. Furthermore, the mere fact that one older employee was passed over for a promotion, and another demoted and then fired, over a period of three years, does not establish "a systematic

16

pattern of concerted ill-treatment of older . . . employees intended to encourage their resignation," *Sommersett v. City of New York*, No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at *7 (S.D.N.Y. June 28, 2011), as Plaintiff argues, (Pl.'s Mem. 17-18).  In sum, the conduct alleged by Plaintiff "lack[s] the pervasiveness, ridicule, or intimidation necessary to create a hostile work environment."  *Mendez-Nouel v. Gucci Am., Inc.*, No. 10 Civ. 3388 (PAE), 2012 WL 5451189, at *10 (S.D.N.Y. Nov. 8, 2012).  Because of these deficiencies, the FAC falls far short of the standard required for a hostile work environment claim to survive dismissal.

## II.    Plaintiff's ADA Discrimination Claims

The ADA provides that, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  To establish a *prima facie* case of employment discrimination under Title I of the ADA, a plaintiff must demonstrate that (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability.  *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)).  As with ADEA discrimination claims, a plaintiff may demonstrate discrimination under the ADA through overt discriminatory conduct or disparate treatment.

An employer may also violate the ADA by failing to provide a reasonable accommodation. A plaintiff states a *prima facie* failure to accommodate claim by demonstrating that

> (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable

accommodation, plaintiff could perform the essential functions of the job at issue;
and (4) the employer has refused to make such accommodations.

*McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 97 (2d Cir. 2009) (quotation marks omitted). A reasonable accommodation to a disability is one that enables the employee "with a disability to enjoy equal benefits and privileges of employment as are enjoyed by … other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o). A reasonable accommodation may include job restructuring, modified work schedules, or reassignment to a vacant position, among other things. 42 U.S.C. § 12111(9)(B).

In addition to stating a *prima facie* discrimination claim based on isolated adverse employment actions or a failure to accommodate, the Second Circuit has recently held that an ADA plaintiff may proceed under a hostile work environment theory. *See Fox v. Costco Wholesale Corp.*, 819 F.3d 65, 74 (2d Cir. 2019) (holding that "disabled Americans should be able to assert hostile work environment claims under the ADA. . . and here we so recognize") (citation omitted). An ADA hostile work environment claim is governed by the same standards applicable to hostile work environment claims under the ADEA and Title VII, as described *infra* pp. 15-16. *See id.* (deriving ADA hostile work environment standard from cases addressing Title VII hostile work environment claims).

Plaintiff claims that Defendant Barry discriminated against him under the ADA when he refused to provide Plaintiff with a reasonable accommodation for his asthma and when he terminated Plaintiff due to his asthma. He also avers that Defendant Barry condoned a hostile work environment. Defendants contend that Plaintiff's claims fail because (1) Plaintiff's asthma is not a disability within the meaning of the ADA, (2) Plaintiff has not plausibly alleged that his employment was terminated under circumstances giving rise to an inference of discrimination, and

(3) Plaintiff has not plausibly alleged a hostile work environment.  For the reasons discussed below, the Court finds that Plaintiff has plausibly pled a discrimination claim under the ADA based on Defendant Barry's alleged failure to accommodate.  However, the Court agrees that Plaintiff's claims fail to the extent that they are premised on theories of discriminatory termination and hostile work environment.

### a.  Disability Under the ADA

The ADA defines disability as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; or (B) a record of such an impairment; or (C) being regarded as having such an impairment."[5]  42 U.S.C. § 1201(2).  Plaintiff attempts to establish his disability under prong (A).

Merely having an impairment is not sufficient to trigger the ADA's protections.  The statutory definition is not satisfied unless a plaintiff also establishes that the impairment affects activity that constitutes "major life activity" and "substantially limits" the identified major life activity "compared to most people in the general population," 29 C.F.R. § 1630.2(j)(10(ii).  *See Jacques v. DiMarzio*, 386 F.3d 192, 201 (2d Cir. 2004).  "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active."  42 U.S.C. § 1201(4)(D).

In the instant case, Plaintiff's asthma qualifies as a physical impairment under the ADA.  *See Nugent v. Rogosin Inst.*, 105 F. Supp. 2d 106, 112 (E.D.N.Y. 2000) (observing that "there can be no dispute that asthma is a physical impairment as defined by the ADA, since it is a physiological disorder or condition which affects the respiratory system, one of the bodily systems

---

[5] Category (C) does not apply to reasonable accommodation claims, because an individual who is merely "regarded as disabled" is not entitled to a reasonable accommodation.  *See Brantman v. Fortistar Capital, Inc.*, No. 15-CV-4774(NSR), 2017 WL 3172864, at *8 n.8 (S.D.N.Y. July 22, 2017).

listed in the statute") (citing 29 C.F.R. § 1630.2(h)(1)).  Plaintiff alleges, in effect, that his asthma impairs his ability to work and to breathe, both of which are explicitly listed in the regulatory definition of "major life activities," *see* 29 C.F.R. § 1630.2(i).  Thus, the only inquiry for the Court is whether Plaintiff plausibly states that his asthma substantially limits either of these two major life activities.

Whether a plaintiff with asthma is substantially limited in his ability to work or to breathe is a fact specific question.  *See Burke v. Niagara Mohawk Power Corp.*, 142 Fed. App'x 527, 529 (2d Cir. 2005) (noting that "asthma does not invariably impair a major life activity"); *Gorbea v. Verizon N.Y., Inc.*, No. 11–CV–3758 (KAM)(LB), 2014 WL 917198, at *8 (E.D.N.Y. March 10, 2014) (plaintiff whose testimony indicated that she could perform all regular life activities on a daily basis without any issues connected to her asthma was not disabled due to asthma under ADA); *Hendler v. Intelecom USA, Inc.*, 963 F. Supp. 200, 207 (E.D.N.Y. 1997) ("Because one plaintiff with asthma is substantially limited in the major life activity of breathing does not mean that every plaintiff with asthma has a qualifying disability under the ADA.").  To plead a substantial limitation on the activity of working, a plaintiff must show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities."  29 C.F.R. § 1630.2(j)(3)(i).  A plaintiff's inability to perform a single job at a single, particular location, does not constitute a substantial limitation to the major life activity of working.  *See Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 523 (1999); *Muller v. Costello*, 187 F.3d 298, 313 (2d Cir. 1999); *Heilweil v. Mount Sinai Hosp.*, 32 F. 3d 718, 723 (2d Cir. 1994).[6]  Here, Plaintiff fails to plausibly

---

[6] Although *Heilweil* involved a claim under the Rehabilitation Act, 29 U.S.C. §§ 701-796, its analysis as to this issue has been applied to ADA claims.  *See, e.g., Muller v. Costello*, 187 F.3d 298, 314 (2d Cir. 1999); *Hendler v. Intelecom USA, Inc.*, 963 F. Supp. 200, 207 (E.D.N.Y. 1997).

allege that his asthma substantially limited his ability to work, since he concedes that it only prevents him from working in a particular location: the stables.

Whether Plaintiff plausibly alleges that his asthma substantially limits his ability to breathe, on the other hand, is a closer question. Plaintiff states that his asthma, although apparently induced and aggravated by the stables, affects him significantly even outside of the stables. He states that his asthma has resulted in medical emergencies including three hospitalizations over a three-month period in 2015. While Plaintiff does not specifically describe any such extreme emergencies after March of 2015, he states that as of July of 2017, when Plaintiff applied for leave under the FMLA, "his breathing and asthma condition progressively was worsening." (FAC ¶ 46.) Moreover, although Plaintiff concedes that his condition could worsen based on his degree of exposure to environmental factors, including cigarette smoke, cold air, and the stables, he does not suggest that he was unaffected by his asthma outside of work. For example, nothing in the FAC indicates that he was able to have a normal, active lifestyle outside of work. *See Muller*, 187 F.3d at 314 (breathing not sufficiently impaired to allege that asthma was a disability where plaintiff was physically active outside work, "participated in many sports and worked as a member of the military reserves"); *Heilweil*, 32 F.3d at 723 (breathing not sufficiently impaired where asthmatic plaintiff was not barred from exercising).[7]

Viewing the facts alleged in the FAC in the light most favorable to Plaintiff, as the Court must on a motion to dismiss, Plaintiff adequately pleads that his asthma substantially affects his

---

[7] The Court notes that *Muller* and *Heilweil*, in drawing their conclusions that the plaintiffs were not disabled, both considered the fact that the plaintiffs' use of asthma medication substantially mitigated their symptoms. Consideration of such a factor is no longer permissible after Congress enacted the ADA Amendments Act (the "ADAAA"), which went into effect on January 1, 2009. *See* ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (Sept. 25, 2008) (adding language prohibiting the consideration of the ameliorative effects of mitigating measures such as medication or reasonable accommodations in determining whether an impairment substantially limits a major life activity).

ability to breathe and qualifies as a disability under the ADA.  Plaintiff states that he could continue to perform his job as a racing inspector if he were allowed a temporary or permanent assignment to work outside the stalls.  Since Plaintiff plausibly alleges that he has a disability, that he requested reasonable accommodations for his disability from Defendant Barry and others, and that such accommodations were denied, his ADA discrimination claim survives to the extent that it is based on Defendant Barry's failure to reasonably accommodate.[8]

### b.  Discriminatory Termination

In addition to claiming that Defendant Barry failed to provide him with reasonable accommodations for his asthma, Plaintiff avers that his employment with the NYSGC was terminated because of his disability.[9]  As with discrimination claims under the ADEA, a plaintiff alleging disability discrimination under the ADA pursuant to a theory that his employer took adverse employment action against him due to his disability may demonstrate circumstances giving rise to an inference of discrimination through evidence of overt discriminatory conduct or disparate treatment.

In his Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Plaintiff's Memorandum"), Plaintiff conflates his discriminatory termination claim with his retaliation claim, claiming that "retaliation for his accommodation requests (his disability) was a motivating factor in his termination."  (Pl.'s Mem. 11.)  Plaintiff's disability discrimination claim is separate and distinct from his disability retaliation claim, even though both are brought

---

[8] Although they argue that Plaintiff's asthma is not a disability, Defendants do not dispute that Plaintiff has pled a failure to provide reasonable accommodation.

[9] As the Second Circuit recently ruled, the "but for" causation standard announced in *Gross* also applies under the ADA.  *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).  As with ADEA discrimination claims, it is not clear whether that standard is also a pleading standard applicable to a motion to dismiss.  In any event, since the Court determines that Plaintiff fails to state a claim for discriminatory termination under either a "but for" causation standard or a more relaxed standard, the Court need not address this issue.

pursuant to the ADA.[10]   To illustrate, consider a disabled plaintiff who is discharged by his employer days after filing a complaint about discrimination he has experienced at work based on his disability.   Such a plaintiff pleads discriminatory termination by alleging that he was fired because he is disabled.   He pleads retaliation by alleging that he was fired because of his engagement in a protected activity, *i.e.*, his filing of a discrimination complaint.   Even though there is only one employment decision at issue, the alleged motivation behind the employer's decision in each instance differs.   Thus, while Plaintiff may properly allege that his termination constitutes improper retaliation for, *inter alia*, his reasonable accommodation requests, he does not state a claim for disability discrimination based on his protected engagement in such activities.   Rather, Plaintiff is required to plausibly allege that he was terminated *because he was an asthmatic*.

Turning to the allegations in the FAC, there is little in the circumstances surrounding Plaintiff's termination to support an inference that Plaintiff's termination was due to his disability. Plaintiff asserts that his supervisors refused to enforce a smoke-free environment around Plaintiff even though they were aware of Plaintiff's breathing condition and Plaintiff had told them and other colleagues that smoking triggered his asthma.   Relatedly, Plaintiff states that he was laughed at or ignored when he complained to his colleagues that their smoking interfered with his breathing, and that one of his supervisors repeatedly shut the air conditioning in the break room over the summer weeks in spite of such supervisor's awareness "that his actions caused [Plaintiff] discomfort and pain," (*id.* ¶ 35.).   Plaintiff alleges that he informed Defendant Barry of this "harassment" on July 17, 2017.   (*Id.* ¶ 32.)

None of these allegations suggest that Plaintiff's termination on September 30, 2017, was due to Plaintiff's status as an asthmatic.   Rather, the factual allegations surrounding Plaintiff's

---

[10] For a discussion of the elements of an ADA retaliation claim, see *infra* pp. 27-28.

termination appear to center exclusively around the retaliatory animus arising from Plaintiff's application for FMLA leave, his filing of disability discrimination charges with the EEOC, and his complaints about alleged harassment and requests for accommodation.  *See Penn v. N.Y. Methodist Hosp.*, No. 11-CV-9137(NSR), 2013 WL 5477600, at *13 (S.D.N.Y. Sept. 30, 2013) (dismissing claim for discriminatory termination where "the factual allegations concerning Plaintiff's termination center[ed] exclusively around retaliatory treatment after filing charges with the EEOC and the [New York City Commission on Human Rights]")

To the extent that Plaintiff relies on allegations of disparate treatment to plead his ADA discrimination claim, his claim remains inadequate.  Plaintiff points to Lauren Spencer's assignment to ID work, (*see* FAC ¶ 33), as evidence of disparate treatment, because Spencer "did not have any breathing, allergy or health issues," (*id.*).  As the Court has discussed, Plaintiff fails to provide any details tending to suggest that Spencer was "similarly situated in all material respects" to Plaintiff.  Even if Plaintiff had done so, it is unlikely that Spencer's assignment to ID work months before Plaintiff's termination, without any other evidence of disparate treatment, would be enough to raise an inference of discrimination with respect to Plaintiff's termination.

Accordingly, Plaintiff's ADA discrimination claim is dismissed to the extent that arises out of his allegations of discriminatory termination.

### c.  Hostile Work Environment

As the Court has observed, an ADA plaintiff claiming discrimination based on the presence of a hostile work environment is beholden to the same standards as Title VII and ADEA plaintiffs. To summarize, in order to prevail on a hostile work environment claim, an ADA plaintiff must show that "the harassment was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment," *Fox*, 918 F.3d at 74 (brackets omitted)

(quotation marks omitted) (citing *Alfano*, 294 F.3d at 373), and was based on the plaintiff's disability, *see Lewis v. Blackman Plumbing Supply L.L.C.*, 51 F. Supp. 3d 289 (S.D.N.Y. 2014).[11] He must also demonstrate that "a specific basis exists for imputing the objectionable conduct to his employer."  *Fox*, 918 F.3d at 74 (quotation marks omitted) (citing *Alfano*, 294 F.3d at 373).

The incidents Plaintiff alleges as constituting a hostile work environment are as follows: (1) one of Plaintiff's supervisors shut off the air conditioning and hid the remote control on several occasions during the summer of 2017; (2) Plaintiff's colleagues smoked in his vicinity and laughed when he complained to them that it interfered with his breathing, and one colleague vaped indoors; (3) Plaintiff's supervisors, including Defendant Wolf, tried to keep him in the horses' stalls longer after they had been informed of his breathing problems; and (4) Plaintiff's colleagues sarcastically offered Plaintiff cigarettes and invited him to smoke with them.  Plaintiff also states that "some of his co-workers openly began to harass Murtha and joke about his disability," (FAC ¶ 34), but Plaintiff does not elaborate on this assertion beyond the foregoing incidents.  Plaintiff states that he complained in writing to a nonparty supervisor about the air conditioning incidents on one occasion, (*id.* ¶ 35), that he complained to Defendant Kotarski "and others" about the indoor vaping, (*id.* ¶ 37), and that he wrote to Defendant Barry in July of 2017 "about the harassment he was experiencing," (*id.* ¶ 32.).  Plaintiff does not state that he ever complained of his colleagues' cigarette smoking to any of the Defendants.

Plaintiff's allegations with regard to colleagues jokingly offering him cigarettes and laughing at his complaints plainly fall short of conduct that could be deemed "harassment," much less conduct so extraordinarily severe and pervasive as to create an objectively hostile work environment.  This is particularly so because Plaintiff alleges no other instances where his

---

[11] The court in *Lewis* assumed, prior to the Second Circuit's ruling in *Fox*, that a hostile work environment claim under the ADA was cognizable.

colleagues made comments implicitly directed at his disability, and does not refer to a single incident where a colleague or supervisor explicitly referred to his asthma or breathing difficulties in any manner.  Plaintiff's claims with regard to the air conditioning are similarly lacking in severity or pervasiveness, occurring as they did on only a handful of occasions over the last summer of Plaintiff's employment.  Even if the air conditioning incidents constituted severe and pervasive behavior, there are no facts in the FAC indicating that the supervisor who allegedly shut off the air conditioning did so with the intention of aggravating Plaintiff's asthma.

Plaintiff's claims with regard to his colleagues' smoking near him and his supervisors' assigning him to longer periods of time in the stalls also fail to state a claim for hostile work environment.  Plaintiff attempts to characterize the incidents of smoking as "severe physical incidents of harassment that subjectively, objectively, and abusively interfered with his job performance," (Pl.'s Mem. 16), relying on cases involving significantly more severe conduct, including threats of assault and sexual violence.  *See, e.g.*, *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 549 (2d Cir. 2010) (sexual comments and threats of severe violence); *Gorzynski*, 596 F.3d at 102-03 (multiple sexual comments and defendant grabbed female employees on multiple occasions).  However, Plaintiff's assertions are belied by the absence of any allegation in the FAC that smoking interfered with his ability to do his job in a tangible way, or that it ever produced a severe allergic reaction in Plaintiff.  Moreover, the fact that some unnamed colleagues laughed at Plaintiff when he complained about their smoking around him, without more, does not give rise to a plausible inference that their smoking was part of a campaign to harass Plaintiff on account of his asthma.  As to the incidents of cigarette smoking in particular, even if such incidents did constitute harassment, Plaintiff does not state that he notified anyone about them so as to provide a basis for imputing them to Defendant Barry.

That Plaintiff's supervisors assigned him "significantly more time inside the stalls than any of his co-workers," (FAC ¶ 27), likewise does not indicate a hostile work environment.  As Plaintiff concedes, working in the stalls and taking urine samples from the horses was part of his job description.  (*Id.* ¶ 13.)  Thus, it was well within the range of activities that an employer such as Wolf could reasonably require Plaintiff to do.  *See Agostinello v. Great Neck Union Free Sch. Dist.*, No. CV05-5838WDW, 2009 238865, at *17 (E.D.N.Y. Feb. 2, 2009).  As to Plaintiff's assertion that Wolf insisted he stay longer with the horses in the stalls "when he told her that he was having breathing issues (a full-blown asthma attack)," (FAC ¶ 28), even if the Court were to find such an incident to be sufficiently severe and based on Wolf's animus against Plaintiff due to his asthma, Plaintiff does not indicate that it occurred on multiple occasions, as would be necessary to plead that it constituted pervasive harassment.

With respect to Plaintiff's allegations related to his being assigned more time in the stalls generally, it appears that Plaintiff is invoking Defendants' failure to grant him reasonable accommodation as evidence of a hostile environment.  However, a defendant's failure to provide a reasonable accommodation does not in itself constitute evidence of a parallel claim for discriminatory termination or hostile work environment.  *See Berger v. New York City Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018).

For the foregoing reasons, Plaintiff's ADA hostile work environment claim is dismissed.

**III.    Plaintiff's Retaliation Claims**

In order to state a claim for retaliation under the ADEA or ADA, as under Title VII, a plaintiff must plausibly allege that "1) the employee engaged in a protected activity; 2) the employer was aware of that activity; 3) the employee suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse employment

action." *Dickens v. Hudson Sheraton Corp., LLC*, 167 F. Supp. 3d 499, 522 (S.D.N.Y. 2016) (quotation marks omitted) (citing *Blanco v. Brogan*, 620 F. Supp. 2d 546, 553 (S.D.N.Y. 2009)) (Title VII and ADEA); *see Muller*, 187 F.3d at 311 (1999) (ADA).

With respect to the fourth element,

> Proof of causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment . . . or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct, or directly through evidence of retaliatory animus directed against a plaintiff by the defendant.

*De Cintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 116 (2d Cir. 1987) (internal citations omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001).

Plaintiff alleges that Defendant Barry, in his official capacity, retaliated against him after he filed his EEOC Charge, in which Plaintiff stated that he was discriminated against on the basis of his age and disability, by terminating Plaintiff's employment. Plaintiff's argument is premised on Defendants' purported receipt of an EEOC notice of charge (the "Notice of Charge") explicitly identifying age and disability as the causes of employment discrimination alleged by Plaintiff. For purposes of Plaintiff's retaliation claims, he engaged in protected activity when he filed the EEOC Charge.[12] *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 583 (S.D.N.Y. 2008); *Bush v. Fordham Univ.*, 452 F. Supp. 2d 394, 416 (S.D.N.Y. 2006); *Senese v. Longwood*

---

[12] The FAC alleges other instances of arguably protected activity undertaken by the Plaintiff prior to his discharge, including his applications to Defendant Barry and others for accommodations for his asthma and complaints about other employees' behavior insofar as it affected Plaintiff's asthma. Since Defendants do not move to dismiss the FAC to the extent it states a claim for retaliation under the ADA based on those activities, the Court does not address them here.

*Central Sch. Dist.*, 330 F. Supp. 3d 745, 774 (E.D.N.Y. 2018).  The Notice of Charge was allegedly sent to Defendant NYSGC on September 18, 2019.  (FAC ¶ 50.)  Plaintiff alleges that Defendant Barry would have been informed of the charge by virtue of his position as Director of Racing Officials.  (*Id.*)  Plaintiff was told to stop coming to work four days later and was fired one week after that.  (*Id.* ¶¶ 51, 54.)

Defendants do not dispute that the temporal relationship between Defendant Barry's alleged notification of Plaintiff's protected activity and Plaintiff's discharge is sufficiently close to plead a causal connection between the two events.  Instead, Defendants argue that Plaintiff fails to state a retaliation claim based on the EEOC Charge because Plaintiff cannot allege that anyone at the NYSGC, including Defendant Barry, had notice of the charge during Plaintiff's employment.  Defendants' argument is based on documents attached to the Declaration of Noam Lerer in support of Defendants' Motion to Dismiss (the "Lerer Declaration.").  (Lerer Decl. (ECF No. 25) Ex. A.)  These documents consist of materials from Plaintiff's EEOC file, including Plaintiff's EEOC Intake Questionnaire, the EEOC's right-to-sue letter addressed to Plaintiff, and the Notice of Charge addressed to "Yonkers Racing Corporation."  (*Id.*)

As a threshold matter, the Court must determine whether it may properly consider the foregoing materials, which are not appended to the FAC, without converting the instant motion into a motion for summary judgment.  Defendants contend that the Court may do so because the documents in question are incorporated by reference in the FAC.  (Defs.' Mem. 5 n.4.)  Plaintiff disagrees, but does not cite to any authority in support of his position.  (Pl.'s Mem. 19.)  Plaintiff does not dispute the authenticity of the EEOC documents.

For a document to be incorporated by reference, the complaint must make a "clear, definite, and substantial reference" to it.  *N.Y. Dist. Council of Carpenters Pension Fund v. Forde*, 939 F.

Supp. 2d 268, 277 (S.D.N.Y. 2013). "Mere discussion or limited quotation of a document in a complaint" does not qualify as incorporation. *DeMasi v. Benefico*, 567 F. Supp. 2d 449, 453 (S.D.N.Y. 2008) (internal quotations omitted).

Here, the FAC alleges that Plaintiff filed a "Charge of Discrimination with the EEOC by completing an Intake Questionnaire for the EEOC," (FAC ¶ 50), received a letter from the EEOC stating that it had notified Plaintiff's employer that Plaintiff filed a charge of discrimination, (*id.*), and received a "Notice of Right to Sue from the EEOC," (*id.* ¶ 5). "'Courts in this Circuit have repeatedly held that when EEOC charges are expressly referred to in the pleading, they may be considered incorporated by reference,' and thus may be considered when deciding a motion to dismiss." *Taylor v. City of New York*, 207 F. Supp. 3d 293, 299 (S.D.N.Y. 2016) (quoting *Muhammad v. New York City Transit Auth.*, 450 F. Supp. 2d 198, 204 (E.D.N.Y. 2006); *see, e.g.*, *Segal v. City Univ. of N.Y.*, 18-CV-4444 (AMD), 2019 WL 2372979, at *1 n.2 (E.D.N.Y. June 4, 2019); *Sternkopf v. White Plains Hosp.*, No. 14–CV–4076 (CS), 2015 WL 5692183, at *4 (S.D.N.Y. Sept. 25, 2015) . Moreover, a Court may take judicial notice of EEOC charges, including notices of charge and right-to-sue notices, because they are public records. *See Muhammad*, 450 F. Supp. 2d at 204-05 ("[P]laintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice."). Because the Court finds that the EEOC Intake Questionnaire, right-to-sue letter, and Notice of Charge are incorporated by reference in the FAC and are public records of which the Court can take judicial notice, the Court will consider them without converting Defendants' argument into a motion for summary judgment.

The Notice of Charge is addressed to "Yonkers Racing Corporation, Attn: Director of Human Resources" at "810 Yonkers Avenue, Yonkers, NY 10704." (Lerer Decl. Ex. A.) In

Plaintiff's EEOC Intake Questionnaire, Plaintiff listed his employer as "NYS Gaming Commission Yonkers Raceway" and provided the same address as listed on the Notice of Charge.  (*Id.*)  A letter from the EEOC to Plaintiff, attached to the FAC, lists "NYS Gaming Commission" as the "respondent" in the file name and states that the EEOC "notified the employer that [Plaintiff] filed a charge."  (FAC Ex. A.)  Defendants' argument, in essence, is that the erroneous listing of "Yonkers Racing Corporation," rather than the NYSGC, as the addressee on the top of the Notice of Charge defeats any inference that the NYSGC or Defendant Barry actually received notice of the charge.  The Court disagrees.  A plaintiff in an employment discrimination action is not required to provide proof of its employers' receipt of an EEOC charge for his retaliation claim to survive a motion to dismiss.  Indeed, a contrary requirement would place an undue burden on plaintiffs, who are highly unlikely to have access to such proof prior to discovery.  On a motion to dismiss, it is sufficient that Plaintiff has alleged that the Notice of Charge was mailed to his workplace, that Defendant Barry would receive notice of such occurrences by virtue of his position of authority within the NYSGC, and that adverse employment action was taken against him mere days later, without any explanation.  *See Moran v. Premier Educ. Group, LP*, 599 F. Supp. 2d 263, 278 (D. Conn. 2009) (defendant's termination of plaintiff's employment less than a week after plaintiff's doctor sent letter requesting reasonable accommodation was sufficient to plead a causal connection between protected activity and alleged retaliation).  Accordingly, Plaintiff's ADEA retaliation and ADA retaliation claims are well-pled to the extent they rely on Plaintiff's filing of the EEOC Charge as the alleged impetus for his termination.

**IV.    Plaintiff's Age and Disability Discrimination and Retaliation Claims Under the NYSHRL**

The NYSHRL makes it unlawful for an employer to terminate or discriminate against an individual in compensation or in terms, conditions or privileges of employment because of such individual's age or disability, among other characteristics.   N.Y. Exec. Law § 296(1)(a).   Age discrimination claims under the NYSHRL are analyzed identically to claims under the ADEA. *See, e.g.*, *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 n.1 (2d Cir. 2009); *Abrahamson v. Board of Educ. of Wappingers Falls Cent. School Dist.*, 374 F.3d 66, 70 n.2 (2d Cir. 2004); *Waters v. General Bd. of Global Ministries*, 769 F. Supp. 2d 545, 556-57 (S.D.N.Y. 2011); *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 505 (S.D.N.Y. 2010).   Since the Plaintiff does not state a discrimination claim under the ADEA, his age discrimination claim under the NYSHRL likewise fails.

As to Plaintiff's NYSHRL disability discrimination claim, "the scope of the disability discrimination provisions of [the NYSHRL] are similar to those of the [ADA] and § 504 of the Rehabilitation Act, a precursor to the ADA."  *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (quotation marks omitted).   Accordingly, the legal standards for discrimination claims under the ADA and the NYSHRL are essentially the same, except to the extent that the NYSHRL has been interpreted to endorse a broader definition of "disability."   *See Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004).   Since the Court has already determined that Plaintiff plausibly alleges a disability under the more stringent ADA standard, it need not address the issue again here.   Similarly, for the same reasons Plaintiff fails to state a disability discrimination claim under the ADA based on his allegations of discriminatory termination and hostile work environment, his parallel claims under the NYSHRL fail.

The NYSHRL also prohibits retaliation against any person because he has opposed a practice forbidden by the NYSHRL.  N.Y. Exec. Law § 296(7).  A *prima facie* case of retaliation under the NYSHRL requires the same elements as retaliation claims under federal employment anti-discrimination laws including Title VII, the ADEA, and the ADA, as discussed herein.  *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361-62 (S.D.N.Y. 2012).

An individual is subject to liability under the NYSHRL (1) if he qualifies as an "employer" or (2) if he aided and abetted the unlawful discriminatory acts of others.  N.Y. Exec. Law § 296(1), (6); *see, e.g.*, *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521-22 (S.D.N.Y. 2015); *E.E.O.C.* v. *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014).

Defendants argue that Barry, Wolf, and Kotarski cannot be held individually liable under the NYSHRL on several grounds.  First, Defendants contend that none of the individual Defendants are "employers" under the NYSHRL.  Second, assuming that their initial argument is successful, Defendants aver that the individual Defendants may not be sued as aiders and abettors because their employer, the NYSGC, is immune from suit under the Eleventh Amendment.  Third, Defendants argue that Plaintiff does not plausibly allege that any of the individual Defendants aided and abetted any discriminatory conduct against him.  Finally, Defendants urge the Court to dismiss Plaintiff's claims for injunctive relief and punitive damages under the NYSHRL.

The Court finds that Plaintiff has sufficiently pled that each of the individual Defendants can be held liable for failure to accommodate under the NYSHRL, and that Defendants Barry and Wolf can be held liable for retaliation.  However, Plaintiff does not state a claim against Defendant Kotarski for retaliation.  Further, the Court agrees with Defendants that Plaintiff's claims for injunctive relief and punitive damages must be dismissed as a matter of law.

### a. Employer Liability

An individual qualifies as an "employer" under the NYSHRL when that individual has an ownership interest in the relevant organization or the "power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542 (1984). Whether a non-owner individual has the requisite power to be considered an employer is determined based on "common-law principles," with greatest emphasis on the alleged employer's power "to order and control" the employee in his or her performance of work. *Griffin v. Sirva*, 29 N.Y.3d 174, 186 (2017) (quotation marks omitted). In assessing the matter of control, courts have asked "'whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Griffin v. Sirva Inc.*, 835 F.3d 283, 291-92 (2d Cir. 2016) (quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999)).

The facts in the FAC, accepted as true, are sufficient to support a claim that Barry had the requisite control over Plaintiff to be considered an "employer" for purposes of the NYSHRL. Although Barry did not hold an ownership interest in the NYSGC, he was its "Director of Racing Officials," who interviewed Plaintiff and offered Plaintiff employment with the NYSGC immediately after the interview "without consulting with anyone else as to Plaintiff's hire." (FAC ¶ 9.) Plaintiff alleges that while he was working for the NYSGC, Barry "had the power to fire employees and did fire employees," and that "Barry alone hired almost all of the [NYSGC] employees, including Kotarski and Wolf." (*Id.*) While the Court agrees with Defendants that Barry's asking Plaintiff to complete a job application after purportedly hiring him, (*Id.* ¶ 9), cuts against Plaintiff's argument that Barry was his employer, Plaintiff has alleged sufficient facts on the whole to plausibly plead that Barry had the power to hire and fire employees and exercised

control over Plaintiff through his management of Plaintiff's supervisors.  That further discovery may reveal otherwise is not relevant to the Court's analysis on a motion to dismiss.  Accordingly, Plaintiff has adequately pled that Barry is his employer for purposes of the NYSHRL.

Under the NYSHRL, an employer may be liable for an employee's discriminatory conduct only if the employer "became a party to it by encouraging, condoning, or approving it."  *Brown v. City of New York*, No. 11 Civ. 2915 (PAE), 2013 WL 3789091, at *18 (S.D.N.Y. July 19, 2013) (internal quotation marks omitted); *see also Doe v. State*, 89 A.D.3d 787, 788 (N.Y. App. Div. 2011) ("It is only after an employer knows or should have known of improper discriminatory conduct that it can 'undertake or fail to undertake action which may be construed as condoning the improper conduct.'" (citations omitted)).  Plaintiff claims he informed Defendant Barry by letter "about his need for a reasonable accommodation," but Barry "took no action in response to Plaintiff's letter."  (FAC ¶ 32.)  He further alleges that Defendant Kotarski and others told him Barry was "openly furious and 'fuming with anger'" when Plaintiff applied for FMLA leave, (*id.* ¶ 47), and that, as Director of Racing Officials, Barry would have been informed of Plaintiff's EEOC Charge when the Notice of Charge was delivered, (*id.* ¶ 50.)  In light of the foregoing, Plaintiff's allegations are sufficient to state claims against Barry as his employer under the NYSHRL based on Barry's failure to accommodate Plaintiff's disability and retaliatory discharge of Plaintiff.

### b.  Accessorial Liability

An individual may be liable for aiding and abetting unlawful discriminatory acts if the individual "actually participates in the conduct giving rise to a discrimination claim," even though that individual lacked the authority to hire or fire the plaintiff.  *Feingold v. New York*, 366 F.3d

138, 158 (2d Cir. 2004) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995)); *see also Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011).

There is a disagreement among district courts in this Circuit over whether an individual can be held liable for aiding and abetting his own conduct giving rise to a claim under the NYSHRL.  *See Canosa v. Ziff*, No. 18 Civ. 4115 (PAE), 2019 WL 498865, at *9 n.13 (S.D.N.Y. Jan. 28, 2019) (comparing cases); *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 522 (S.D.N.Y. 2015) (comparing cases).  For example, in *Johnson v. Cnty. of Nassau*, 82 F. Supp. 3d 533 (E.D.N.Y. 2015), the court held that a plaintiff who brings a claim under the NYSHRL based on his employer's having encouraged condoned, or approved the discriminatory conduct of a sole employee, may rely on the same discriminatory conduct to prove, "perhaps circularly," individual liability under the aiding and abetting provision of the NYSHRL.  *Johnson*, 82 F. Supp. 3d at 535 (brackets omitted) (quotations omitted); *see also Setty v. Fitness*, No. 17-CV-06504 (NGG) (SMG), 2018 WL 8415414, at *8 (E.D.N.Y. Dec. 18, 2018); *Wenchun Zheng v. Gen. Elec. Co.*, No. 1:15-CV-1232 (TJM/CFH), 2016 WL 10859373, at *4-*5 (N.D.N.Y. Jan. 12, 2016); *Boston v. Taconic Mgmt.*, No. 12–CV–4077 (ER), 2014 WL 4184751, at *2 n. 9 (S.D.N.Y. Aug. 22, 2014); *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 436 (E.D.N.Y. 2012); *Mahar v. Alliance Mortgage Banking Corp.*, 650 F. Supp. 2d 249, 262 (E.D.N.Y. 2009); *Lewis v. Triborough Bridge and Tunnel Auth.*, No. 97 Civ. 0607 PKL, 2001 WL 46986, at *2 (S.D.N.Y. Jan. 18, 2001). Conversely, in *Bliss v. MXK Restaurant Corp.*, 220 F. Supp. 3d 419 (S.D.N.Y. 2016), the court stated that "as a matter of law as well as logic, 'an individual cannot aid or abet his or her own violation of the [NYSHRL].'"  *Bliss*, 220 F. Supp. 3d at 426 (quoting *Hardwick v. Auriemma*, 983 116 A.D.3d 465, 468 (N.Y. App. Div. 2014); *see also Malanga v. NYU Langone Med. Ctr.*, No. 14cv9681, 2015 WL 7019819, at *5 (S.D.N.Y. Nov. 12, 2015); *Raneri v. McCarey*, 712 F. Supp.

2d 271, 282 (S.D.N.Y. 2010); *Hicks v. IBM,* 44 F. Supp. 2d 593 (S.D.N.Y. 1999); *Falbaum v. Pomerantz*, 891 F. Supp. 986 (S.D.N.Y. 1995).

Courts that have adopted the line of reasoning set forth in *Johnson* appear to rely on the Second Circuit's expansive proposition in *Tomka* that an individual may be held liable under the NYSHRL if he actually participated in conduct giving rise to the claim of discrimination.  *See Tomka*, 66 F.3d at 1317.  In *Tomka*, plaintiff's allegations that "each of the individual defendants assaulted her and thereby created a hostile work environment" was held "sufficient to satisfy [the NYSHRL's aiding and abetting provision]."  *Id.*  One interpretation of that holding is that, since each of the employees' actions imposed liability on their employer, the employees aided and abetted the employer's violation of the NYSHRL.  Alternatively, the Second Circuit may have reached its conclusion because each of the employees aided and abetted one another's violations. Pursuant to the latter rationale, it would appear that a sole employee whose discriminatory conduct violated the NYSHRL and rendered his employer vicariously liable could not be liable for aiding and abetting his own violation.  The Second Circuit has not clarified the line of reasoning it relied on in making its decision.

Here, whether the rationale behind the Second Circuit's decision in *Tomka* matches the first or second of the foregoing interpretations is of little import, because, like the plaintiff in *Tomka*, Plaintiff alleges that each of the three individual Defendants separately engaged in conduct contributing to violations of the NYSHRL.  Specifically, Plaintiff avers that Defendant Barry, as his employer, ignored his requests for reasonable accommodation and sanctioned his termination after Plaintiff applied for FMLA leave and filed charges with the EEOC.  (FAC ¶¶ 32, 50.)  He also avers that he asked Defendant Wolf if he could leave the horses' stalls due to his asthma, but that she not only denied his request but also "insisted that he stay longer with the horses in the

stalls." (*Id.* ¶ 28.)  Finally, Plaintiff states that he asked Defendant Kotarski to be moved out of the stalls but that Kotarski sent him to Wolf, Barry, and others, none of who granted Plaintiff's request.  (*Id.* ¶ 31.)

Based on these assertions, Plaintiff states a claim for discriminatory failure to provide reasonable accommodations against Barry, and a claim for aiding and abetting such failure as against both Wolf and Kotarski.  Plaintiff also states a claim sounding in retaliation for his requesting reasonable accommodations against both Barry and Wolf, and sounding in retaliatory discharge for his filing of an FMLA application and the EEOC Charge as against Barry.[13] However, Plaintiff fails to plead any facts suggesting that Kotarski aided or abetted any alleged retaliation against Plaintiff.

### c.  Claims for Injunctive Relief and Punitive Damages

Defendants correctly argue that Plaintiff's demands for injunctive relief and punitive damages under the NYSHRL must be dismissed.  "It is well settled that federal courts may not grant declaratory or injunctive relief against a state agency based on violations of state law." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 93 (2d Cir. 1998).  Plaintiff may not circumvent this prohibition by seeking injunctive relief against state officials in their personal

---

[13] "Unlike claims of discrimination, which limit what qualifies as an 'adverse employment action' to changes in the terms and conditions of employment, adverse employment actions in the context of a claim of retaliation are much broader." *Jeffries v. Verizon,* No. CV 10–2686(JFB)(AKT), 2012 WL 4344197, at *18 (E.D.N.Y. Aug. 31, 2012) *report and recommendation adopted,* No. 10–CV–2686 (JFB)(AKT), 2012 WL 4344188 (E.D.N.Y. Sept. 21, 2012); *see Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 67 (2006) ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm.").  The expanded definition of adverse employment action embraced by *White* in the context of Title VII retaliation claims applies to retaliation claims under the ADA and ADEA, as the same standard applies to all three.  Thus, "the proper question for a retaliation claim is 'whether the alleged adverse action to which the plaintiff was subject could well have dissuaded a reasonable employee in his position from complaining of unlawful discrimination.'"  *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 44 (2d Cir. 2019).  While the Court has generally confined itself to discussing Plaintiff's allegations of retaliatory termination, Plaintiff's allegations that Defendants forced him to work longer in the stalls after he requested accommodations for his asthma, (FAC ¶¶ 27-28), may also rise to the level of adverse action for the purpose of Plaintiff's retaliation claims, even though they are not adverse for the purpose of Plaintiff's discrimination claims.  Thus, Defendant Wolf may be liable for retaliation under the NYSHRL.

capacity, since injunctive relief against a state official may only be awarded in an official capacity suit.  Further, the "NYSHRL does not provide for punitive damages." *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 235 (2d Cir. 2000) (citing *Thoreson v. Penthouse Int'l. Ltd.*, 80 N.Y.2d 490, 496 (1992)).

## V.    Amendment

Defendants seek to preclude Plaintiff from further amending his complaint because Plaintiff waited to file the FAC until after he was served with Defendants' initial motion to dismiss. (*See* Defendants' August 27, 2018, Letter to Court (ECF No. 20).)  Since Plaintiff has already had the benefit of amending his claims in response to Defendants' motion, argue Defendants, "any further amendment would be both futile and unjustifiably dilatory."  (Defs.' Mem. 2.)

At this juncture, the Court does not find the relief sought by Defendant to be appropriate. Courts "should freely give leave [to amend] when justice so requires."   Fed. R. Civ. P. 15. Accordingly, Plaintiff may make an application to this Court to further amend the FAC as to those claims that the Court is dismissing without prejudice on or before October 16, 2019, if he be so advised.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED to the extent that (1) the FAC's third and seventh causes of action are dismissed without prejudice in their entirety, (2) the first and sixth causes of action are dismissed in part without prejudice to the extent they are premised on Plaintiff's allegations of discriminatory termination and hostile work environment, (3) the eighth cause of action is dismissed without prejudice as against Defendant Thom Kotarski,

and (4) the sixth and eighth causes of action are dismissed without prejudice to the extent that they seek injunctive relief and punitive damages, and the motion to dismiss is otherwise DENIED.

Plaintiff shall have until October 16, 2019, to seek leave to file a second amended complaint as to those claims that are dismissed without prejudice.  If Plaintiff does not timely seek leave to further amend, all claims dismissed pursuant to this Opinion and Order will be dismissed with prejudice, and Defendants shall file answers on or before November 18, 2019.  The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 22.


Dated: September 17, 2019                                              SO ORDERED:

        White Plains, New York

                                                            _____
                                                                NELSON S. ROMÁN
                                                              United States District Judge