UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JAMES MURTHA,

               Plaintiff,

-against-

NEW YORK STATE GAMING
COMMISSION, et al.,

               Defendants.

**MEMORANDUM OPINION
AND ORDER**

17-CV-10040 (PMH)

PHILIP M. HALPERN, United States District Judge:

      James Murtha ("Plaintiff") brings this action against the New York State Gaming Commission ("Gaming Commission"), Brian Barry ("Barry"), Dr. Stephanie Wolf ("Wolf"), and Thomas Kotarski ("Kotarski," and collectively, "Defendants") alleging, *inter alia*, that: (1) he was discriminated against because Defendants failed to provide him with a reasonable accommodation in violation of Title I of the Americans with Disability Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*; and (2) he was retaliated against for engaging in protected activity in violation of (i) Title V of the ADA, (ii) the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, (iii) the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, and (iv) the NYSHRL.

      On September 17, 2019, Judge Román issued an Opinion & Order, granting in part Defendants' partial motion to dismiss. (Doc. 28). Following that decision, the parties engaged in discovery on Plaintiff's remaining claims. On April 3, 2020, this case was reassigned to me. On June 14, 2021, Defendants' motion for summary judgment, which is the subject of this decision, was fully submitted. (Doc. 66; Doc. 67, "Def. Br."; Doc. 75, "Pl. Opp."; Doc. 76, "Reply").

**BACKGROUND**

The facts recited herein are drawn from the First Amended Complaint (Doc. 16, "FAC"); Defendants' Amended Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1 and Plaintiff's Rule 56.1 Counterstatement (Doc. 68, "56.1 Stmt."); the Amended Declaration of Rene F. Hertzog and exhibits annexed thereto (Doc. 69); the Declaration of Ronald Ochrym (Doc. 70, "Ochrym Decl."); the Declaration of Brian Barry (Doc. 71, "Barry Decl."); the Declaration of Thom Kotarski (Doc. 72, "Kotarski Decl."); the Declaration of Lisa Fitzmaurice and exhibits annexed thereto (Doc. 73, "Fitzmaurice Decl."); the Declaration of Steven Sledzik and exhibits annexed thereto (Doc. 74, "Sledzik Decl."); the Reply Affirmation of Rene F. Hertzog and exhibits annexed thereto (Doc. 77, "Hertzog Aff."); and the Supplemental Declaration of Rene F. Hertzog and exhibits annexed thereto (Doc. 78, "Hertzog Decl.").

I.   The Defendants

The Gaming Commission is headquartered in Schenectady, New York, and regulates all aspects of legalized gaming in New York State, including harness horse racing at Yonkers Raceway in Yonkers, New York.[1] (56.1 Stmt. ¶¶ 1-2). The Gaming Commission employs individuals at the licensed harness track facilities in New York, including Yonkers Raceway, in capacities such as investigators, judges, and veterinarians, to facilitate the regulation of activities at its licensed facilities. (Ochrym Decl. ¶ 5).

Barry was employed by the Gaming Commission as the Director of Racing Officials. (*Id*. ¶ 3). His main duties and responsibilities were to assist in hiring, training, and supervising the *per diem* workers (known as racing officials) at the harness tracks, including Yonkers Raceway. (Hertzog Decl. Ex. 3, "Barry Dep. Tr." at 10:11-14). As part of his responsibilities, Barry

---

[1] Throughout Plaintiff's employment, Yonkers Racing Corporation was the private entity licensed by the Gaming Commission to conduct harness horse races at Yonkers Raceway. (56.1 Stmt. ¶ 2).

interviewed racing officials and made hiring recommendations to Ronald Ochrym ("Ochrym"), the Director of the Division of Racing and Pari-Mutuel Wagering. (Barry Dep. Tr. at 13:13-19, 16:16-25). Ochrym ultimately made all hiring decisions. (Barry Dep. Tr. at 13:20-23; Ochrym Decl. ¶ 9).

Wolf was the State Supervising Veterinarian for harness tracks, including Yonkers Raceway. (56.1 Stmt. ¶ 9). She oversaw, as Supervising Veterinarian, the collection and handling of urine and blood samples from horses participating in harness races. (*Id*. ¶ 10).

Kotarski, beginning in 2015, was employed by the Gaming Commission as the Supervising Inspector at Yonkers Raceway. (*Id*. ¶ 11). As such, he directly supervised Racing Inspectors, i.e., the employees whose primary duty was to collect, label, and secure urine specimens from horses after races. (*Id*. ¶¶ 19-20).

II.     Plaintiff's Employment as a Racing Inspector

Following an extended period of unemployment, Plaintiff applied for a position as a Racing Inspector at Yonkers Raceway in August 2014. (Hertzog Decl. Ex. 16, "Jayne Murtha Dep. Tr." at 22:15-23:17; Barry Dep. Tr. at 32:14-16, 33:8-34:15). Barry interviewed Plaintiff for this position and recommended to Ochrym that he be hired. (Barry Dep. Tr. at 32:12-16, 35:13-16). After Plaintiff completed the application process, which included fingerprinting and a background check, he was hired on a temporary *per diem* basis by the Gaming Commission and began his employment in September 2014. (56.1 Stmt. ¶¶ 13-14; Barry Dep. Tr. at 32:25-35:12; Fitzmaurice Decl. ¶ 4); Fitzmaurice Decl. Ex. 1; Hertzog Decl. Ex. 1, "Murtha Dep. Tr." at 17:19-18:22).

As discussed above, Plaintiff's primary duty as a Racing Inspector was to collect, label, and secure urine specimens from horses after they finished racing. (56.1 Stmt. ¶ 19; Barry Dep. Tr. at 33:8-34:15 (stating that the "main part of the job is to collect urine samples" from horses)).

3

During a typical shift, a Racing Inspector was assigned to one horse in every other race. (56.1 Stmt. ¶ 27). Following each race, a Racing Inspector was responsible for leading his or her assigned horse to a testing stall located in the paddock area of Yonkers Raceway to collect a urine sample. (*Id*. ¶¶ 22, 28-29). Once at the testing stall, the Racing Inspector would stand inside the stall or by the door while waiting for the horse to urinate. (*Id*. ¶ 29).

Separate from urine collection, some Racing Inspectors were given the task of identifying horses (known as "identification work") based on each horse's freeze brand.[2] (*Id*. ¶ 31). A Racing Inspector, however, would not perform identification work during the same shift that he or she was responsible for collecting urine samples. (*Id*. ¶¶ 30-31). Plaintiff performed some identification work during the course of his employment, but following his misidentification of a horse at the 2015 International Trot, he was not regularly assigned to identification work. (*Id*. ¶¶ 37-38; Barry Dep. Tr. at 36:17-37:25). At times, the Gaming Commission used a rotation system to assign Racing Inspectors to identification work at Yonkers Raceway, but following a separate incident where a horse was misidentified, the Gaming Commission determined that a single, consistent Racing Inspector should be assigned to identification work rather than using a rotation.[3] (56.1 Stmt. ¶ 40).

III.  The Paddock at Yonkers Raceway

The paddock, i.e., the area of Yonkers Raceway where the testing stalls were located, was subject to extreme temperatures and had no central heat or air conditioning.[4] (*Id*. ¶¶ 22, 44, 91). In

---

[2] A freeze brand is a tattoo on a horse's neck consisting of letters and numbers that is used to identify horses for harness races. (Barry Dep. Tr. at 37:21-25).

[3] Anthony DelBene, another Racing Inspector, was ultimately assigned to identification work on a permanent basis. (Kotarski Decl. ¶ 3).

[4] Four of the testing stalls had straw covering the floor and one stall had woodchips. (56.1 Stmt. ¶ 22).

4

addition to its lack of temperature control, the paddock had mold in certain areas, a leaky roof, and hay, straw, dander, urine, and feces could be found throughout. (*Id*. ¶¶ 41-43).

Identification work was performed in racing stalls also located in the paddock. (*Id*. ¶ 32). The racing stalls were smaller than the testing stalls used for urine collection and did not have straw on their floors. (*Id*. ¶ 33).

IV.   Plaintiff's Breathing Problems and Request for Identification Work

Plaintiff began experiencing breathing issues sometime after beginning his employment as a Racing Inspector. (FAC ¶ 1; Murtha Dep. Tr. at 132:6-19). While Plaintiff is not sure what triggers his breathing issues, his condition worsened over time and, in 2017, he was diagnosed with occupational induced asthma. (FAC ¶¶ 1, 24; Murtha Dep. Tr. at 165:19-24; Jayne Murtha Dep. Tr. at 51:2-10). To help alleviate Plaintiff's breathing issues, Kotarski and Wolf would assign Plaintiff to the early races when possible, so that his shift could end sooner. (56.1 Stmt. ¶ 77). Plaintiff would also take breaks in the air-conditioned offices at Yonkers Raceway when he was experiencing difficulty breathing. (Murtha Dep. Tr. at 138:20-25, 140:15-18, 141:7-12). Further, Plaintiff would not come to work on days when the air quality was poor (*id*. at 139:14-140:2), and he was not required to come in if he was experiencing breathing issues that he felt prevented him from being able to work (56.1 Stmt. ¶ 76).

On July 5, 2017, Plaintiff sent a text message to Kotarski asking to be temporarily or permanently assigned to identification work because he was having problems breathing in the testing stalls. (*Id*. ¶¶ 45, 83). Kotarski told Plaintiff he would speak to Barry about his request. (*Id*. ¶ 83). Kotarski also asked Plaintiff for how long he was seeking to be assigned to identification work, to which Plaintiff responded he was "not sure." (*Id*.). Kotarski, in a July 8, 2017 text message to Plaintiff, confirmed that he spoke with Barry about Plaintiff's request and that Barry was going

5

to speak with Nick Ferriero ("Ferriero"), the Gaming Commission's Presiding Judge at the time. (*Id.*). In the meantime, Kotarski offered to assign Plaintiff to the early races in his usual role as a urine collector. (*Id.*). On August 1, 2017, Plaintiff sent Kotarski a text message asking about the status of his request, to which Kotarski responded that he had passed the request along to his superiors. (*Id.*).

On July 10, 2017, Plaintiff applied for FMLA leave benefits, and his application was approved on August 17, 2017. (*Id.* ¶¶ 69, 72).[5] Plaintiff, however, did not use his FMLA leave. (FAC ¶ 48). On July 17, 2017, Plaintiff sent a letter to Barry, in which he asked to be assigned more identification work. (Murtha Dep. Tr. at 145:4-18; Barry Dep. Tr. at 62:8-19; Sledzik Decl. Ex. 5). Barry never received that letter. (Barry Dep. Tr. at 62:8-19). At some point in July 2017, Plaintiff and Barry spoke on the phone about Plaintiff's request for more identification work. (56.1 Stmt. ¶ 84). Barry planned to discuss Plaintiff's request with him, Ferriero, Wolf, and Kotarski when Barry visited Yonkers Raceway later that month; but when Barry visited on July 21, 2017, Plaintiff was out sick. (*Id.* ¶¶ 85-86). Barry was then out of work on extended sick leave from July 27, 2017 to October 2, 2017, by which point, Plaintiff had already been terminated. (*Id.* ¶ 57; Ochrym Decl. ¶ 18; Barry Decl. ¶ 8).

V.   Plaintiff's Job Performance, Behavior in the Workplace, and Termination

In the final year of Plaintiff's employment, he became "difficult to work with" due to his "outbursts of anger and violence," which "made people uncomfortable." (Hertzog Decl. Ex. 6,

---

[5] Plaintiff contends that Barry and Wolf took issue with his FMLA leave application. (Murtha Dep. Tr. at 148:6-8, 160:11-22; Hertzog Aff. Ex. 1, "Muscari Dep. Tr." at 93:22-25). But that contention is supported solely by Plaintiff's self-serving testimony and inadmissible hearsay evidence, which cannot defeat a summary judgment motion. *See Capobianco v. City of New York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[I]nadmissible hearsay [is] an insufficient basis for opposing a motion for summary judgment."); *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 326 (S.D.N.Y. 2015) ("[U]nsubstantiated and self-serving testimony is insufficient, without more, to defeat summary judgment.").

6

"Wolf Dep. Tr." at 99:11-19; *id*. Ex. 14 at 47:18-23 (describing co-workers' complaints about Plaintiff's "attitude"), 48:9-14 ("[Plaintiff] would just start yelling and screaming at people for no reason . . . .")). Plaintiff's job performance also "deteriorated very rapidly" during this time period. (Wolf Dep. Tr. at 135:8-136:12).

On September 18, 2017, Mark Stuart ("Stuart"), an attorney for the Gaming Commission, forwarded Ochrym a written complaint made by a Gaming Commission employee against Plaintiff, which stated, *inter alia*, that Plaintiff had called Wolf a "cunt," a "whore," a "[N]azi," and a "bitch," and that he had called Barry a "spiteful piece of shit." (56.1 Stmt. ¶ 47).[6] Concerned for Yonkers Raceway employees' safety, Ochrym launched an investigation to gather more information about the allegations. (*Id*. ¶ 48). Ochrym, in conducting this investigation, spoke to Ferriero, who informed Ochrym that Yonkers Raceway employees had made multiple complaints against Plaintiff and confirmed that Plaintiff was difficult to work with. (*Id*. ¶ 49). Then, on September 21, 2017, Stuart forwarded to Ochrym more written complaints against Plaintiff that Ferriero had received from various Yonkers Raceway employees. (*Id*. ¶ 50). These complaints described, *inter alia*, Plaintiff's "tantrums," aggressive behavior, and poor attitude in the performance of his responsibilities. (*Id*.). The next day, in a September 22, 2017 meeting about the then-upcoming 2017 Sire Stakes Championships, which were being held at Yonkers Raceway, Wolf informed Ochrym that she felt uncomfortable around Plaintiff and feared for her safety and the safety of the other Racing Inspectors. (*Id*. ¶ 51).

After reviewing the written complaints against Plaintiff and speaking with Gaming Commission employees at Yonkers Raceway, Ochrym concluded that the allegations against

---

[6] Plaintiff disputes that he called Wolf a "whore," a "[N]azi," and a "cunt." (56.1 Stmt. ¶ 47). He does not dispute that he called Wolf a "bitch," nor does he dispute that he called Barry a "spiteful piece of shit." (*Id*.).

7

Plaintiff were significant enough to warrant Plaintiff's termination. (*Id.* ¶ 52). Ochrym did not speak to or consult with Barry, who was out of work on extended sick leave at the time, in making the decision to terminate Plaintiff. (*Id.* ¶ 57; Ochrym Decl. ¶ 18; Barry Decl. ¶ 8). Ferriero, at Ochrym's instruction, informed Plaintiff that his services were not needed beginning on September 22, 2017. (56.1 Stmt. ¶ 53; Ochrym Decl. ¶ 16). Ferriero informed Plaintiff of his termination in a telephone call on September 30, 2017. (56.1 Stmt. ¶ 54). Plaintiff's termination was confirmed in a letter dated October 4, 2017. (*Id.* ¶ 55).

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, 442 F. Supp. 3d 714, 722 (S.D.N.Y. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248). The Court's duty, when determining whether summary judgment is appropriate, "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence; the task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial . . . ." *Bellotto v. Cty. of Orange*,

248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)). Claims simply cannot proceed in the absence of sufficient proof as to an essential element.

"It is the movant's burden to show that no genuine factual dispute exists," *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)), and a court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id*. (citing *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003)). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*, 442 F. Supp. 3d at 722 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts . . . ." *Id*. (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, "[i]f there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its "entitlement to judgment as a matter of law." *In re Davis New York Venture Fund Fee Litig.*, 805 F. App'x 79, 80 (2d Cir. 2020) (quoting *FIH, LLC v. Found. Capital Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Stated simply, the movant must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) (explaining "that summary judgment is appropriate only when . . . law supports the moving party"); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is

appropriate when "the law so favors the moving party that entry of judgment in favor of the movant . . . is proper").

## ANALYSIS

I. Sovereign Immunity

Plaintiff's federal claims for relief are asserted only against Barry in his official capacity as Director of Racing Officials for the Gaming Commission, while his NYSHRL claims are alleged against Barry, Wolf, and Kotarski in their individual capacities. (FAC ¶¶ 56-63, 67-74, 75-78, 82-85). As a threshold matter, Defendants argue that Plaintiff's federal claims are barred by the Eleventh Amendment. (Def. Br. at 11-12; Reply at 2).

"The Eleventh Amendment bars from federal court all suits by private parties against a state unless the state consents to such a suit or Congress has abrogated its immunity validly." *Stinson v. City Univ. of New York*, No. 19-CV-04191, 2019 WL 3287958, at *3 n.1 (S.D.N.Y. July 19, 2019); *see also Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363-64 (2001); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Such immunity applies to Plaintiff's claims under the ADA, ADEA, and FMLA asserted against Barry in his official capacity. *See Bleichert v. New York State Educ. Dep't*, 793 F. App'x 32, 34 (2d Cir. 2019) (ADEA); *Darcy v. Lippman*, 356 F. App'x 434, 436 (2d Cir. 2009) (ADA and ADEA); *Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (FMLA).

The Supreme Court recognized an exception to the sovereign immunity doctrine, however, in *Ex parte Young*, 209 U.S. 123 (1908). The *Ex parte Young* exception permits an individual defendant to be sued in his or her official capacity to the extent the plaintiff seeks prospective injunctive relief from that defendant, such as reinstatement. *See Redman v. New York State Dep't of Corr. Servs.*, No. 10-CV-05368, 2011 WL 5119574, at *2 (S.D.N.Y. Oct. 12, 2011). Crucially,

this exception only applies where the individual defendant being sued in his or her official capacity has the power to provide the plaintiff's requested relief. *See Siani v. State Univ. of New York at Farmingdale*, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014) (holding that *Ex parte Young* "exception to sovereign immunity only authorizes suit against officials *with the authority to provide the requested relief*" (emphasis added)); *see also Redman*, 2011 WL 5119574, at *2 ("[C]laims for reinstatement are actionable when made against a state official *with the power to reinstate*." (emphasis added)).

Here, reinstatement is the only prospective injunctive relief sought by Plaintiff against Barry in his official capacity. (FAC ¶¶ 59, 63, 70, 74). Plaintiff fails to put forth sufficient evidence, however, to create an issue of fact as to whether Barry has the authority to reinstate him. Simply put, the record is clear that Barry does not have such authority. (Barry Decl. ¶ 10; Ochrym Decl. ¶ 19).

For starters, Plaintiff argues that the Director of Racing Officials is responsible for the "selection" of racing officials. (Pl. Opp. at 4). The Duty Statement (i.e., official job description) for the Director of Racing Officials makes clear, however, that that individual does not have the power to hire and fire. (Sledzik Decl. Ex. 1, "Duty Statement"; 56.1 Stmt. ¶ 4). To the extent the Director of Racing Officials is involved in the selection process, his or her role is limited to "*mak[ing] recommendations* concerning retention, reassignment and termination." (Duty Statement (emphasis added)). Barry's inability to make hiring and firing decisions is confirmed by Ochrym, the actual individual with the power to make such decisions. (Ochrym Decl. ¶¶ 9 ("Ultimately, I decide who to hire for Racing Inspector positions"), 19 ("Mr. Barry, in his capacity as the Director of Racing Officials, does not have the authority to reinstate Mr. Murtha to his prior position.")). While Barry would sometimes be involved in the hiring process, his role was limited

11

to interviewing applicants and making recommendations to Ochrym. (*Id*. ¶ 9; Barry Decl. ¶ 9; Barry Dep. Tr. at 13:13-23, 14:11-13, 16:16-25). Such proof is dispositive on the issue of Barry's lack of authority.

The rest of Plaintiff's evidence is consistent with the official description of Barry's role as a participant, not decision-maker, in the hiring process. Plaintiff offers testimony from himself and other Gaming Commission employees to purportedly support the fact that Barry had the power to hire people. But the testimony cited by Plaintiff merely shows that Barry was tasked with *communicating* job offers to people once the ultimate hiring decision had been made. (Murtha Dep. Tr. at 17:10-15 ("[Barry] *told me* that day that I was hired." (emphasis added)); Muscari Dep. Tr. at 11:7-12:5 (testifying that Barry "*offered* me the job") (emphasis added)); Hertzog Decl. Ex. 10, "Kotarski Dep. Tr." at 11:13-15 (testifying that Barry "*offered* the position when [he] first started one day a week" (emphasis added)); *id*. at 13:7-12 (testifying hat Barry "*offered* [him] the position of backup recording judge" and "permanent recording judge" (emphasis added))). Indeed, evidence that Barry communicated job offers to new hires does not support a finding that he also had the power to make hiring decisions. To the contrary, the Affidavit of Ronald Ochrym makes crystal clear that he, not Barry, had the authority to hire and fire Plaintiff. (Ochrym Decl. ¶¶ 9, 19).

Faced with this evidence, which establishes Barry's lack of authority and Ochrym's authority, Plaintiff puts forth speculative, self-serving, and in some instances, inadmissible hearsay evidence in an attempt to create an issue of fact as to whether Barry has the authority to reinstate him. For instance, Plaintiff claims that he "was told by several former employees" that Barry had terminated them and made statements suggesting that he had the power to do so. (Sledzik Decl. Ex. 2, ¶ 4). But such hearsay cannot overcome a summary judgment motion. *See Capobianco*, 422 F.3d at 55. Further, Plaintiff relies on Kotarski's testimony that it was his "understanding" that

12

Barry hired and fired employees at Yonkers Raceway. (Kotarski Dep. Tr. at 41:3-8). Such testimony, however, is speculative and without evidentiary support and, therefore, cannot be relied upon. *See Capobianco v. Stop & Shop Supermarket Co. LLC*, No. 14-CV-06112, 2017 WL 1157173, at *2 (S.D.N.Y. Mar. 24, 2017) ("The nonmoving party 'may not rely on conclusory allegations or unsubstantiated speculation.'" (quoting *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010))). Lastly, Plaintiff offers the testimony of another Gaming Commission employee, Chris Muscari ("Muscari"), who during his deposition claimed that Barry "hires everyone at the racetrack." (Muscari Dep. Tr. at 16:23-17:6). Aside from being speculative, Muscari's claim, when put into context with his other testimony that Barry "said he *would* hire [him]" and "made [his] job *offer* to [him]," is consistent with other Gaming Commission employees' testimony that Barry's role is limited to simply communicating hiring decisions, as opposed to making them. (*Id.* at 11:16-17 (emphasis added), 12:2-4 (emphasis added)). Ochrym is the individual with the authority needed for reinstatement. (Ochrym ¶ 9).

Because there is no dispute as to Barry's inability to provide Plaintiff's requested relief—namely, reinstatement—Plaintiff's ADA, ADEA, and FMLA claims, which are pressed against Barry only, are dismissed for lack of subject matter jurisdiction, as they are barred by the Eleventh Amendment. *See Morales v. New York*, 22 F. Supp. 3d 256, 268 (S.D.N.Y. 2014) ("A claim that is barred by a state's sovereign immunity must be dismissed pursuant to the Eleventh Amendment for lack of subject matter jurisdiction."). The Court need not and does not address the merits of Plaintiff's remaining NYSHRL claims as it declines to exercise supplemental jurisdiction over those claims.[7]

---

[7] Defendants requested that, in the event Plaintiff's federal claims are dismissed, the Court decline to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims. (Def. Br. at 22 n.5). Plaintiff, in his opposition, did not object to this request (Reply at 9 n.12), and therefore any such objection is waived. *See Cafasso v. Nappe*, 2017 WL 4167746, at *5 (D. Conn. Sept. 20, 2017) (noting that party waives argument

13

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment with respect to Plaintiff's claims for relief asserted under federal law is GRANTED. The Court declines to exercise supplemental jurisdiction over Plaintiff's NYSHRL claims. and dismisses same without prejudice to re-filing in the proper forum.

The Clerk of the Court is respectfully directed to (1) terminate the motion sequence pending at Doc. 66; and (2) close this case.

SO ORDERED:

Dated: White Plains, New York
       March 15, 2022

_____
Philip M. Halpern
United States District Judge

---

by failing to address it in opposition to motion for summary judgment); *In re UBS AG Secs. Litig.*, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (recognizing that party "concedes through silence" arguments by its opponent that it fails to address).